Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

TOBY PEARSON, derivatively on behalf of WM TECHNOLOGY, INC.,

Plaintiff,

v.

DOUGLAS FRANCIS, TONY AQUILA, ANTHONY BAY, BRENDA FREEMAN, OLGA GONZALEZ, SCOTT GORDON, CHRISTOPHER BEALS, ARDEN LEE, SUSAN ECHARD, JUSTIN HARTFIELD, FIONA TAN, and MARY HOITT,

Defendants,

and

WM TECHNOLOGY, INC.,

Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff Toby Pearson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant WM Technology, Inc. ("WM" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Douglas Francis ("Francis"), Tony Aquila ("Aquila"), Anthony Bay ("Bay"), Brenda Freeman ("Freeman"), Olga Gonzalez ("Gonzalez"), Scott Gordon ("Gordon"), Christopher Beals ("Beals"), Arden Lee ("Lee"), Susan Echard ("Echard"), Justin Hartfield ("Hartfield"), Fiona Tan ("Tan"), and Mary Hoitt ("Hoitt") (collectively, the "Individual Defendants," and together with WM, "Defendants") for breaches of their fiduciary duties as directors and/or officers of WM, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Beals, Lee, Francis, Echard, Hoitt, and Gordon for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WM, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 25, 2021 through September 24, 2024, inclusive (the "Relevant Period").

2.     WM is a Delaware-incorporated company with headquarters in Irvine, California that operates a leading online cannabis marketplace for consumers, known as Weedmaps, in addition to a suite of eCommerce and compliance software solutions for cannabis businesses. One of the Company's key operating metrics is the number of "monthly active users" ("MAU") for the Company's online marketplace.

3.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

4.     The truth fully emerged on September 25, 2024 when the SEC issued a litigation release ("Release") announcing it had charged WM, its former Chief Executive Officer ("CEO"), Defendant Beals, and its former Chief Financial Officer ("CFO"), Defendant Lee, for making negligent misrepresentations in WM's public reporting of MAUs. The Release further revealed that the SEC had "also instituted a related settled administrative proceeding against WM Technology" and that WM "also agreed to pay a civil penalty of $1,500,000."

5.     On this news, the price per share of the Company's stock fell by 1.9% to close at $0.92 per share on September 25, 2024.

6.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, seven of the Individual

Defendants sold Company shares at inflated prices for combined total proceeds of approximately $2 million.

7.    Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

8.    In light of the Individual Defendants' misconduct—which has subjected the Company and various of the Individual Defendants to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

9.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

10.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the Individual Defendants' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act,

Verified Shareholder Derivative Complaint

15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

15.     Plaintiff is a current shareholder of WM. Plaintiff has continuously held WM common stock at all relevant times.

### Nominal Defendant WM

16.     WM is a Delaware corporation with its headquarters at 41 Discovery, Irvine, California 92618. WM's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MAPS."

17.     Until June 16, 2021, WM was a private company operating under the name WM Holding Company, LLC ("Legacy WM"). On June 16, 2021, Legacy WM merged with Silver Spike Acquisition Corp. ("Silver Spike"), thereby forming the Company, which was named WM Technology, Inc.

### Defendant Francis

18.     Defendant Francis has served as a Company director since June 2021 and as Executive Chair since August 2022. Defendant Francis also co-founded Legacy WM and served as Chairperson of Legacy WM's board of managers from March 2019 to June 2021,

CEO of Legacy WM from February 2016 to March 2019, and as President of Legacy WM from January 2009 to February 2016. According to the Schedule 14A the Company filed with the SEC on June 10, 2024 (the "2024 Proxy Statement"), as of May 13, 2024, Defendant Francis beneficially owned 4,792,347 shares of the Company's Class A common stock and 22,970,182 shares of the Company's Class V common stock, equating to a combined voting power of 18.4%.

19.     For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Francis received $1,162,045 in total compensation from the Company, which included $388,384 in salary, $700,000 in bonus, and $73,661 in all other compensation. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Francis received $263,058 in total compensation from the Company, which included $193,357 in stock awards and $69,701 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Francis received $418,175 in total compensation from the Company, which included $27,260 in fees earned or paid in cash and $390,915 in equity awards.

20.     The 2024 Proxy Statement stated the following about Defendant Francis:

*Douglas Francis*. Mr. Francis, age 46, has served as a member of the Board since June 2021, and as Executive Chair since August 2022. Mr. Francis is a co-founder of WM Holding Company, LLC (when referred to in its pre-Business Combination capacity, "Legacy WMH"), and served as Chairperson of Legacy WMH's board of managers from March 2019 to June 2021 and as a member of Legacy WMH's board of managers prior to that. Mr. Francis previously served as Legacy WMH's Chief Executive Officer from February 2016 until March 2019 and as Legacy WMH's President from January 2009 to February 2016. Mr. Francis has served in management positions in each of Legacy WMH's current subsidiaries. Mr. Francis holds a B.S. in Business Administration and Management from Chapman University. Mr. Francis was selected to serve on the Board based on his perspective, experience and institutional knowledge as WMH's co-founder and his long tenure as WMH's President and Chief Executive Officer.

**Defendant Aquila**

21.    Defendant Aquila has served as a Company director since June 2021. He also serves as Chair of the Compensation Committee. According to the 2024 Proxy Statement, as of May 13, 2024, Defendant Aquila beneficially owned 5,297,761 shares of the Company's Class A common stock, equating to a combined voting power of 3.5%.

22.    For the 2023 Fiscal Year, Defendant Aquila received $700,661 in total compensation from the Company, which included $65,000 in fees earned or paid in cash, $600,364 in stock awards, and $35,297 in all other compensation. For the 2022 Fiscal Year, Defendant Aquila received $255,357 in total compensation from the Company, which included $62,000 in fees earned or paid in cash and $193,357 in equity awards. For the 2021 Fiscal Year, Defendant Aquila received $424,718 in total compensation from the Company, which included $33,803 in fees earned or paid in cash and $390,915 in equity awards.

23.    The 2024 Proxy Statement stated the following about Defendant Aquila:

*Tony Aquila*. Mr. Aquila, age 59, has served as a member of the Board since June 2021. Since April 2021, Mr. Aquila has served as the Chief Executive Officer of Canoo, Inc., a mobility technology company, and as the Executive Chairman of the Board of Canoo since December 2020. In June 2019, Mr. Aquila founded AFV Partners, an affirmative low-leverage capital vehicle that invests in long-term mission critical software, data and technology businesses and has served as its Chairperson and Chief Executive Officer since its founding. In 2005, Mr. Aquila founded Solera Holdings Inc., and led it as Chairperson and Chief Executive Officer to a $1 billion initial public offering in 2007, and in the following years sourced and executed over 50 acquisitions significantly expanding Solera's total addressable market. Mr. Aquila oversaw Solera's $6.5 billion transaction from a public-to-private business in 2016. Mr. Aquila has also served as a member of the Arkansas Council on Future Mobility since February 2022 and as a member of the board of directors of The Lost Explorer Mezcal Company, a sustainable producer and distributor of handcrafted mezcal, since May 2021. Furthermore, Mr. Aquila currently serves as the Chairperson for Aircraft Performance Group, LLC, a global provider of mission critical flight operations software, since January 2020, RocketRoute Limited, a global aviation services company, since March 2020, and APG Avionics LLC, an aviation data and software company for the general aviation market, since September 2020.

From November 2018 to July 2020, Mr. Aquila served as the Global Chairperson of Sportradar Group, a sports data and content company. Mr. Aquila has also served as a director of Guardianship Services Inc., a nonprofit organization providing guardianship and support services to at-risk adults in Tarrant County, Texas since October 2020.

Mr. Aquila was selected to serve on the Board based on his business experience as a founder, inventor, chief executive officer and director of publicly-listed companies and his investing experience.

### **Defendant Bay**

24.    Defendant Bay has served as a Company director since March 2022. He also serves as a member of the Audit Committee and the Compensation Committee.

25.    For the 2023 Fiscal Year, Defendant Bay received $516,614 in total compensation from the Company, which included $122,500 in fees earned or paid in cash and $394,114 in stock awards. For the 2022 Fiscal Year, Defendant Bay received $676,005 in total compensation from the Company, which included $80,378 in fees earned or paid in cash and $595,627 in equity awards.

26.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bay made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| 2024-06-24 | 67,797 | $1.01 | $68,746 |
| 2023-09-11 | 20,024 | $1.63 | $32,659 |

Thus, in total, before the fraud was exposed, Defendant Bay sold 87,821 shares of Company stock on inside information, for which he received approximately $101,405 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.    The 2024 Proxy Statement stated the following about Defendant Bay:

*Anthony Bay*. Mr. Bay, age 68, has served as a member of the Board since March 2022. Prior to joining the Board, Mr. Bay served on three public boards, including two as Chairman as well as numerous private boards. Since September 2019, Mr. Bay has served as the Founder and Chief Executive Officer of Techquity, a technology advisory firm helping innovative companies leverage software and cloud operations to scale faster with less risk. From 2013 to 2016, he served as Chief Executive Officer of Rdio, a leading global music subscription streaming service with over 70 million registered users and 14 million active. In November 2015, Rdio filed for Chapter 11 bankruptcy relief as a condition of its sale to Pandora. Prior to Rdio, Mr. Bay served as a Vice President and Global head for Digital Video for Amazon from 2011 to 2013, responsible for all aspects of the company's Digital Video and streaming business globally. During his eight year tenure at Microsoft, Mr. Bay was Corporate Vice President and General Manager of Microsoft's Digital Media Division and a member of Microsoft's executive staff. Prior to that, Mr. Bay was General Manager of Microsoft's Commercial Systems Division, responsible for developing core components of Microsoft's Internet services platform, including ISP/carrier infrastructure, website development and eCommerce. Mr. Bay joined Microsoft as part of the MSN management team in 1994, eventually overseeing all MSN development and production systems. From 1986 to 1994, Mr. Bay also worked at Apple Computer in various product leadership roles, including three years at Apple's European headquarters in Paris. Mr. Bay holds an MBA from San Jose State University and undergraduate degree in Economics from the University of California, Los Angeles.

Mr. Bay was selected to serve on the Board based on his business experience as a founder, chief executive officer and various leadership positions of technology companies, and as a director of private and publicly-listed companies.

**Defendant Freeman**

28.    Defendant Freeman has served as a Company director since June 2021. She also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

29.    For the 2023 Fiscal Year, Defendant Freeman received $710,138 in total compensation from the Company, which included $183,000 in fees earned or paid in cash, $500,363 in stock awards, and $26,775 in all other compensation. For the 2022 Fiscal Year,

Defendant Freeman received $273,857 in total compensation from the Company, which included $80,500 in fees earned or paid in cash and $193,357 in equity awards. For the 2021 Fiscal Year, Defendant Freeman received $434,804 in total compensation from the Company, which included $43,889 in fees earned or paid in cash and $390,915 in equity awards.

30.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Freeman made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| 2024-06-24 | 90,396 | $1.01 | $91,299 |
| 2024-06-18 | 4,038 | $1.11 | $4,482 |
| 2023-09-07 | 20,634 | $1.43 | $29,527 |

Thus, in total, before the fraud was exposed, Defendant Freeman sold 115,068 shares of Company stock on inside information, for which she received approximately $125,308 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

31.     The 2024 Proxy Statement stated the following about Defendant Freeman:

*Brenda Freeman*. Ms. Freeman, age 59, has served as a member of the Board since June 2021. Ms. Freeman founded and has served as President of Joyeux Advisory Group LLC, a firm providing advisory services to early-stage startups and Fortune 500 companies, since January 2018. Since April 2021 Ms. Freeman has also served as a partner of Debut Capital. Ms. Freeman previously served as Chief Brand Officer of Wunderkind Corporation, a company that creates personalized marketing solutions, from April 2020 through March 2023. Prior to that, Ms. Freeman served as Chief Executive Officer for Arteza, Inc., a direct-to-consumer arts and crafts manufacturing and supply company from February 2020 to February 2021. From March 2016 to December 2018, Ms. Freeman was Chief Marketing Officer of Magic Leap, Inc., a virtual reality technology company, and from

Verified Shareholder Derivative Complaint

December 2018 to April 2019 was Senior Advisor to the Chief Executive Officer. From March 2015 to March 2016, Ms. Freeman served as Chief Marketing Officer of National Geographic Channel, a television network and channel. Prior to that, Ms. Freeman served as Chief Marketing Officer at Turner Broadcasting Systems, Inc. and was Vice President, television marketing at DreamWorks Animation SKG Inc. Ms. Freeman has been a member of the boards of directors of Blue Apron Holdings, Inc. since October 2020 (which became privately owned in November 2023), of Caleres, Inc. since April 2017 and of Avnet, Inc. since November 2018. Ms. Freeman previously served on the board of directors of Herman Miller, Inc. from January 2016 to June 2019 and on the board of directors of RTW Retailwinds, Inc. from April 2019 to April 2020. Ms. Freeman holds a B.S. degree in chemical engineering and an M.B.A degree from the University of Maryland.

Ms. Freeman was selected to serve on the Board based on her business experience and technology industry expertise.

**Defendant Gonzalez**

32.    Defendant Gonzalez has served as a Company director since June 2021. She also serves as Chair of the Audit Committee.

33.    For the 2023 Fiscal Year, Defendant Gonzalez received $647,436 in total compensation from the Company, which included $120,000 in fees earned or paid in cash, $500,363 in stock awards, and $27,073 in all other compensation. For the 2022 Fiscal Year, Defendant Gonzalez received $263,357 in total compensation from the Company, which included $70,000 in fees earned or paid in cash and $193,357 in equity awards. For the 2021 Fiscal Year, Defendant Gonzalez received $429,079 in total compensation from the Company, which included $38,164 in fees earned or paid in cash and $390,915 in equity awards.

34.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Gonzalez made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
| --- | --- | --- | --- |

| 2024-06-24 | 90,396 | $1.01 | $91,390 |
| 2024-06-18 | 4,038 | $1.11 | $4,482 |
| 2023-09-12 | 20,636 | $1.55 | $31,923 |

Thus, in total, before the fraud was exposed, Defendant Gonzalez sold 115,070 shares of Company stock on inside information, for which she received approximately $127,795 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

35.    The 2024 Proxy Statement stated the following about Defendant Gonzalez:

*Olga Gonzalez*. Ms. Gonzalez, age 57, has served as a member of the Board since June 2021. Since April 2023, Ms. Gonzalez has served as CEO and President of Wild Fork USA. Prior to that, from April 2022 to April 2023 and January 2021 to April 2022, Ms. Gonzalez served as Global COO and Global Business Leader, respectively, for Wild Fork Foods, an online specialty food service. Prior to that, Ms. Gonzalez held various leadership positions at Walmart Inc., including Senior Vice President and Chief Financial Officer at Walmart México y Centroamérica from July 2017 to April 2020, Vice President Commercial & Operations Finance at Walmart México y Centroamérica from October 2014 to June 2017, Chief Financial Officer at Walmart Chile from 2011 to 2014, and Vice President, Internal Audit Services Latin America at Walmart US from 2010 to 2011. Previously, Ms. Gonzalez had served as Director, Internal Audit at General Motors Company from 2006 to 2010 and from 1996 to 2004, Vice President, Enterprise Risk and Assurance Services at the American Express Company from 2004 to 2006, and Internal Audit at Banco Santander from 1989 to 1996. Ms. Gonzalez holds a Bachelor of Business Administration degree from Pontificia Universidad Católica de Puerto Rico and an M.B.A. from Florida International University.

Ms. Gonzalez was selected to serve on the Board based on her business experience and financial expertise.

**Defendant Gordon**

36.    Defendant Gordon has served as a Company director since June 2021. He also serves as a member of the Audit Committee and the Compensation Committee.

37.    For the 2023 Fiscal Year, Defendant Gordon received $323,328 in total compensation from the Company, which included $97,500 in fees earned or paid in cash, $187,864 in stock awards, and $37,964 in all other compensation. For the 2022 Fiscal Year, Defendant Gordon received $256,357 in total compensation from the Company, which included $63,000 in fees earned or paid in cash and $193,357 in equity awards. For the 2021 Fiscal Year, Defendant Gordon received $425,263 in total compensation from the Company, which included $34,348 in fees earned or paid in cash and $390,915 in equity awards.

38.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Gordon made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|------------------------|--------------|
| 2024-06-24 | 112,994 | $1.01 | $114,236 |
| 2024-06-18 | 5,047 | $1.11 | $5,602 |
| 2023-09-07 | 25,794 | $1.43 | $36,937 |

Thus, in total, before the fraud was exposed, Defendant Gordon sold 143,835 shares of Company stock on inside information, for which he received approximately $156,775 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

39.    The 2024 Proxy Statement stated the following about Defendant Gordon:

*Scott Gordon*. Mr. Gordon, age 62, has served as a member of the Board since June 2021. Mr. Gordon has held the dual roles of Chief Executive Officer and Chairperson of the board of directors of Silver Spike Investment Corp. since its founding. Similarly, he served in the same capacities for Silver Spike Acquisition Corp. from its inception until June 2021. Mr. Gordon is the co-founder and since 2016 has been the Chairperson of Egg Rock Holdings, parent company of the Papa & Barkley family of cannabis products with related subsidiary assets in manufacturing, processing, and logistics. Egg

Rock Holdings also is the parent company of Papa & Barkley Essentials, a hemp-derived CBD business based in Colorado. From 2016 to 2018, Mr. Gordon was also President of Fintech Advisory Inc., investment manager for a multibillion dollar family office fund focused on long-term and opportunistic investments in emerging markets. From 2013 to 2016, Mr. Gordon served as a Portfolio Manager at Taconic Capital Advisors, a multi-strategy investment firm. Prior to joining Taconic, Mr. Gordon was a Partner and Portfolio Manager at Caxton Associates from 2009 to 2012. He was also a Senior Managing Director and Head of Emerging Markets at Marathon Asset Management from 2007 to 2009. Earlier in his career, Mr. Gordon also held leadership positions at Bank of America and ING Capital. Mr. Gordon was a founding member of the Emerging Markets business at JP Morgan where he worked upon graduating from Bowdoin College in 1983.

Mr. Gordon was selected to serve on the Board based on his experience in emerging markets and in the cannabis sector.

**Defendant Beals**

40.    Defendant Beals served as CEO of WM and Legacy WM from March 2019 until November 2022. According to the 2024 Proxy Statement, as of May 13, 2024, Defendant Beals beneficially owned 428,773 shares of the Company's Class A common stock and 6,166,819 shares of the Company's Class V common stock, equating to a combined voting power of 4.4%.

41.    For the 2022 Fiscal Year, Defendant Beals received $2,136,675 in total compensation from the Company, which included $510,000 in salary, $565,430 in stock awards, and $1,061,245 in all other compensation. For the 2021 Fiscal Year, Defendant Beals received $10,614,467 in total compensation from the Company, which included $600,000 in salary, $10,000,000 in stock awards, and $14,467 in all other compensation.

42.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Beals made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|

| 2022-08-23 | 45,655 | $2.65 | $121,031 |
| 2022-08-23 | 45,655 | $2.65 | $121,031 |
| 2022-05-18 | 29,442 | $5.47 | $161,047 |
| 2022-03-02 | 49,515 | $5.63 | $279,017 |

Thus, in total, before the fraud was exposed, Defendant Beals sold 170,267 shares of Company stock on inside information, for which he received approximately $682,126 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

43.    The Schedule 14A the Company filed with the SEC on April 29, 2022 (the "2022 Proxy Statement") stated the following about Defendant Beals:

> *Christopher Beals*. Mr. Beals, age 42, has served as our Chief Executive Officer and as a member of the Board since June 2021. Mr. Beals served as WM Holding Company, LLC's ("WMH LLC" and when referred to in its pre-Business Combination capacity, "Legacy WMH") Chief Executive Officer from March 2019 to June 2021 and as a member of its board of managers since October 2015. Mr. Beals previously served as Legacy WMH's General Counsel from September 2015, and Legacy WMH's President from February 2016 to March 2019. Mr. Beals previously served as Senior Vice President of Colbeck Capital Management from December 2014 to August 2015 and Senior Corporate Counsel & Data Privacy Officer at T-Systems International GmbH from February 2013 to December 2014. He also previously worked as an associate at Davis Polk & Wardwell LLP and Covington & Burling LLP. Mr. Beals holds a B.S. in Systems Engineering and a B.A. in Economics from the University of Pennsylvania and a J.D. from the University of Pennsylvania Law School.
>
> Mr. Beals was selected to serve on the Board based on his substantial business, leadership and management experience as WMH's Chief Executive Officer.

**<u>Defendant Lee</u>**

44.    Defendant Lee served as CFO of WM and Legacy WM from February 2019 until he resigned on June 30, 2023.

45.    For the 2022 Fiscal Year, Defendant Lee received $539,233 in total compensation from the Company, which included $500,000 in salary, $28,125 in non-equity incentive plan compensation, and $11,108 in all other compensation. For the 2021 Fiscal Year, Defendant Lee received $9,180,797 in total compensation from the Company, which included $500,000 in salary, $667,081 in bonus, $8,000,000 in stock awards, and $13,716 in all other compensation.

46.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Lee made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| 2023-02-21 | 22,290 | $1.35 | $30,002 |
| 2022-11-17 | 28,977 | $1.20 | $34,685 |
| 2022-08-23 | 27,876 | $2.65 | $73,899 |
| 2022-08-23 | 27,876 | $2.65 | $73,899 |
| 2022-05-18 | 27,990 | $5.47 | $153,105 |
| 2022-03-02 | 44,541 | $5.64 | $251,033 |

Thus, in total, before the fraud was exposed, Defendant Lee sold 179,550 shares of Company stock on inside information, for which he received approximately $616,623 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

47.    The Schedule 14A the Company filed with the SEC on April 27, 2023 (the "2023 Proxy Statement") stated the following about Defendant Lee:

*Arden Lee*. Mr. Lee served as our Chief Financial Officer since June 2021. Mr. Lee served as Legacy WMH's Chief Financial Officer from February 2019 to June 2021. Prior to joining Legacy WMH, Mr. Lee was the Vice President of Global Business Planning at Nike, Inc. from December 2016 to July 2018 and previously worked at Goldman Sachs & Co. from April 2007

to November 2016, most recently holding the position of Managing Director of Investment Banking. Mr. Lee also previously served as Vice President, Investment Banking at Citigroup, Inc. and Vice President, Mergers and Acquisitions at Deutsche Bank Securities. He holds an A.B. in Economics from Princeton University.

**Defendant Echard**

48.    Defendant Echard has served as WM's Interim CFO since February 2024.

49.    The 2024 Proxy Statement stated the following about Defendant Echard:

**Susan Echard**. Ms. Echard has served as Interim Chief Financial Officer since February 2024. Since February 2021 Ms. Echard has been a Partner of SeatonHill Partners, LP ("SeatonHill") a leading national CFO services firm that also offers project based financial leadership. While serving as a partner at SeatonHill, Ms. Echard served from June 2021 to June 2023 as CFO for Direct Digital Holdings, an online solutions provider in digital marketing & advertising. Prior to that, from April 2019 to February 2021, Ms. Echard served as CFO for Trinity Capital Investment, a venture debt and equipment financing provider to growth-stage companies, and, in such capacity, was responsible for all aspects of the firm's financial matters, investor relations, legal and human resource management. Prior to joining Trinity, Ms. Echard served as the Chief Financial Officer at CUBEX LLC, a medical, dental and veterinary inventory management company, from January 2017 to February 2019. Ms. Echard is an accomplished executive with over 35 years' experience, both domestic and international, within Big Four and CFO roles. Ms. Echard has a Bachelor of Business Administration degree in accounting from the University of Michigan-Flint.

**Defendant Hoitt**

50.    Defendant Hoitt served as WM's Interim CFO from July 2023 until February 2024.

**Defendant Hartfield**

51.    Defendant Hartfield served as a Company director from June 2021 until he resigned in August 2023. Defendant Hartfield also cofounded Legacy WM and served as a member of Legacy WM's board of managers since its inception.

52.    For the 2023 Fiscal Year, Defendant Hartfield received $68,684 in total compensation from the Company, which included $35,000 in fees earned or paid in cash

and \$33,684 in all other compensation. For the 2022 Fiscal Year, Defendant Hartfield received \$243,357 in total compensation from the Company, which included \$50,000 in fees earned or paid in cash and \$193,357 in equity awards. For the 2021 Fiscal Year, Defendant Hartfield received \$418,175 in total compensation from the Company, which included \$27,260 in fees earned or paid in cash and \$390,915 in equity awards.

53.     The 2023 Proxy Statement stated the following about Defendant Hartfield:

*Justin Hartfield.* Mr. Hartfield, age 39, has served as a member of the Board since June 2021. Mr. Hartfield is a co-founder of Legacy WMH, and served as a member of Legacy WMH's board of managers since inception and served as Legacy WMH's Chairperson of the board from February 2016 to March 2019. Previously, Mr. Hartfield served as Legacy WMH's Chief Executive Officer until February 2016. Mr. Hartfield holds a B.S. in Computer and Information Sciences and Supportive Services from the University of California, Irvine.

Mr. Hartfield was selected to serve on the Board based on his perspective, experience and institutional knowledge as WMH's co-founder and his long tenure as WMH's President and Chief Executive Officer.

### **Defendant Tan**

54.     Defendant Tan served as a Company director from June 2021 until she resigned in August 2024.

55.     For the 2023 Fiscal Year, Defendant Tan received \$552,664 in total compensation from the Company, which included \$122,000 in fees earned or paid in cash, \$394,114 in stock awards, and \$36,550 in all other compensation. For the 2022 Fiscal Year, Defendant Tan received \$246,857 in total compensation from the Company, which included \$53,500 in fees earned or paid in cash and \$193,357 in equity awards. For the 2021 Fiscal Year, Defendant Tan received \$420,083 in total compensation from the Company, which included \$29,168 in fees earned or paid in cash and \$390,915 in equity awards.

56.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Tan made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| 2024-06-24 | 113,672 | $1.01 | $114,695 |
| 2024-06-18 | 5,078 | $1.11 | $5,636 |
| 2023-09-07 | 25,948 | $1.44 | $37,442 |

Thus, in total, before the fraud was exposed, Defendant Tan sold 144,698 shares of Company stock on inside information, for which she received approximately $157,773 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

57.     The 2024 Proxy Statement stated the following about Defendant Tan:

*Fiona Tan*. Ms. Tan, age 53, has served as a member of the Board since June 2021. Since March 2022, Ms. Tan has served as Chief Technology Officer for Wayfair LLC, where she previously served as the Global Head of Customer and Supplier Technology from September 2020 to March 2022. She has held various leadership positions at Walmart Inc., including Head of Technology for Walmart US from March 2019 to September 2020, Senior Vice President of Engineering and Customer Technology for Walmart Labs from January 2017 to March 2019 and Vice President of Engineering and International Markets for Walmart Labs Strategy and Operations from April 2014 to January 2017. Additionally, Ms. Tan was Vice President of Engineering for Ariba, Inc. from January 2012 to April 2014 and held the same role at TIBCO Software, Inc. from January 1995 to October 2011, and worked as a Senior Technical Staff Member role at Oracle Corporation from January 1993 to May 1995. Ms. Tan holds an M.S. in Computer Science from Stanford University and a B.S. in Computer Science and Engineering from the Massachusetts Institute of Technology.

Ms. Tan was selected to serve on the Board based on her business experience and technology industry expertise.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

58.    By reason of their positions as officers, directors, and/or fiduciaries of WM and because of their ability to control the business and corporate affairs of WM, the Individual Defendants owed WM and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage WM in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of WM and its shareholders so as to benefit all shareholders equally.

59.    Each director and officer of the Company owes to WM and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of WM, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

61.    To discharge their duties, the officers and directors of WM were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of WM, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual

Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

63.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

64.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of WM were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to WM's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how WM conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of WM and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that WM's operations would comply with all applicable laws and WM's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

65.    Each of the Individual Defendants further owed to WM and the shareholders the duty of loyalty requiring that each favor WM's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

66.    At all times relevant hereto, the Individual Defendants were the agents of each other and of WM and were at all times acting within the course and scope of such agency.

67.    Because of their advisory, executive, managerial, directorial, and controlling

positions with WM, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

68.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by WM.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

71.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of WM was a direct, necessary, and substantial

participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

72.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

73.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of WM and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### False and Misleading Statements

### *May 25, 2021 Registration Statement and May 26, 2021 Proxy Statement*

74.    On May 25, 2021, WM filed a fourth Amended Registration Statement (the "Registration Statement") on Form S-4 with the SEC. The following day, WM filed a Schedule 14A with the SEC (the "2021 Proxy Statement") to solicit votes for its June 10, 2021, Special Meeting to approve the planned merger between Legacy WM and Silver Spike. The Registration Statement and 2021 Proxy Statement both contained the following table:

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2020 | 2021 |
| | (dollars in thousands, except for revenue by client) | | | | |
| Paying clients[3] | 4,024 | 4,644 | 3,786 | 4,101 | 4,058 |
| MAUs (in thousands)[4] | 4,684 | 8,009 | 10,000 | 6,457 | 9,163 |

75.    In the Forms 10-Q the Company filed with the SEC on August 13, 2021, November 12, 2021, February 25, 2022, and May 6, 2022, the Company reported the following MAU metrics:

| Filing Date | Reporting Period | Disclosed MAU |
|---|---|---|
| 8/13/2021 | 2Q 2021 | 12.3 million "monthly active users" |
| 11/12/2021 | 3Q 2021 | 13.9 million "monthly active users" |
| 2/25/2022 | 4Q 2021 | 15.73 million "monthly active users" |
| 5/6/2022 | 1Q 2022 | 16.43 million "monthly active users" |

### February 25, 2022 Form 10-K

76.    On February 25, 2022, the Company filed its annual report with the SEC on Form 10-K for the 2021 Fiscal Year (the "2021 10-K"). The 2021 10-K was signed by Defendants Beals, Lee, Aquila, Francis, Freeman, Gonzalez, Gordon, Hartfield, and Tan and contained SOX certifications signed by Defendants Beals and Lee attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

### 2022 Proxy Statement

77.    On April 29, 2022, WM filed the 2022 Proxy Statement with the SEC. Defendants Beals, Bay, Aquila, Freeman, Gonzalez, Francis, Gordon, Hartfield, and Tan solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

78.    The 2022 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Beals, Tan, and Bay to the Board; (2) ratify the appointment of Baker Tilly US, LLP ("Baker Tilly") as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of WM's principal executive officer, principal financial officer, and three most highly compensated executive officers for 2021.

79.    Regarding the "Role of the Board in Risk Oversight," the 2022 Proxy Statement stated the following:

One of the Board's key functions is informed oversight of the Company's risk management process. The Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various Board committees that address risks inherent in their respective areas of oversight. In particular, the Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company. The Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee is also responsible for monitoring compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. The Audit Committee's responsibilities also include oversight of cybersecurity risk management. The Nominating and Corporate Governance Committee is responsible for monitoring the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. The Compensation Committee is responsible for assessing and monitoring whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. While the Board and its committees oversee risk management strategy, management is responsible for implementing and supervising day-to-day risk management processes and reporting to the Board and its committees on such matters.

80.     Regarding the Code of Conduct, the 2022 Proxy Statement stated the following:

The Board adopted a Code of Conduct (the "Code of Conduct"), applicable to all of our employees, executive officers and directors. The Code of Conduct is available on our website at ir.weedmaps.com. The nominating and corporate governance committee of the Board is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for employees, executive officers and directors. We expect that any amendments to the Code of Conduct, or any waivers of its requirements, will be disclosed on our website.

81.     Defendants Beals, Bay, Aquila, Freeman, Gonzalez, Francis, Gordon, Hartfield, and Tan caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the MAU metric had been willfully inflated, and did not

accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

82.    The 2022 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

83.    As a result of Defendants Beals, Bay, Aquila, Freeman, Gonzalez, Francis, Gordon, Hartfield, and Tan causing the 2022 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Beals, Tan, and Bay to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Baker Tilly as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of WM's principal executive officer, principal financial officer, and three most highly compensated executive officers for 2021.

### *August 9, 2022 Form 10-Q*

84.    On August 9, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2022 ("2Q22") (the "2Q22 10-Q"). The 2Q22 10-Q attached certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Francis and Lee attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

### *November 8, 2022 Form 10-Q*

85. On November 8, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended September 30, 2022 ("3Q22") (the "3Q22 10-Q"). The 3Q22 10-Q attached SOX certifications signed by Defendants Francis and Lee attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

### March 16, 2023 Form 10-K

86. On March 16, 2023, the Company filed its annual report on Form 10-K with the SEC for the 2022 Fiscal Year (the "2022 10-K"). The 2022 10-K was signed by Defendants Francis, Lee, Aquila, Bay, Freeman, Gonzalez, Gordon, Hartfield, and Tan and contained SOX certifications signed by Defendants Francis and Lee attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

### 2023 Proxy Statement

87. On April 27, 2023, WM filed the 2023 Proxy Statement with the SEC. Defendants Bay, Aquila, Freeman, Gonzalez, Francis, Hartfield, Tan, and Gordon solicited the 2023 Proxy Statement, which contained material misstatements and omissions.

88. The 2023 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Aquila, Freeman, and Gonzalez to the Board; (2) ratify the appointment of Baker Tilly as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of WM's principal executive officer, principal financial officer, and three most highly compensated executive officers for 2022.

89. Regarding the "Role of the Board in Risk Oversight," the 2023 Proxy Statement stated the following:

> Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, cybersecurity, legal and compliance, and reputational. We have designed and implemented processes to manage these risks. Management is responsible for the day-to-day implementation, oversight and management of risks and risk processes our

company faces, while the Board, as a whole and assisted by its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed.

The Board administers this oversight function directly through the Board as a whole, as well as through various Board committees that address risks inherent in their respective areas of oversight. The Board believes that open communication between management and the Board is essential for effective risk management and oversight. Consistent with this approach, the Board, with the assistance of its committees, regularly reviews our strategic and operational risks in the context of discussions with management, question and answer sessions, and reports from the management team at each of its regular meetings. Directors also have access to management outside of its regular meetings and are free to ask questions and receive information necessary to perform their duties as a director.

In particular, the Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company, and for coordinating with management on decisions relating to any matters that carry potential enterprise-level risks. The Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including management's guidelines and policies around quarterly reporting. The Audit Committee is also responsible for monitoring compliance with legal and regulatory requirements, including our Related Person Transaction Policy, in addition to oversight of the performance of our internal audit function. The Audit Committee's responsibilities also currently include oversight of cybersecurity risk management, although the Board is evaluating potential future changes to the split of responsibility between the Audit and Technology Committees for oversight of cybersecurity risks. The Nominating and Corporate Governance Committee is responsible for monitoring the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. The Compensation Committee is responsible for assessing and monitoring whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. The Technology Committee is responsible for oversight of the management of risks related to the Company's technology, data, information security and

tracking, and related matters, including disclosure of the Company's key metrics and other operational data.

90.     Regarding the Code of Conduct, the 2023 Proxy Statement stated the following:

> The Board adopted a Code of Conduct (the "Code of Conduct"), applicable to all of our employees, executive officers and directors. The Code of Conduct is available on our website at ir.weedmaps.com. The nominating and corporate governance committee of the Board is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for employees, executive officers and directors. We expect that any amendments to the Code of Conduct, or any waivers of its requirements, will be disclosed on our website.

91.     Defendants Bay, Aquila, Freeman, Gonzalez, Francis, Hartfield, Tan, and Gordon caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

92.     The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

93.     As a result of Defendants Bay, Aquila, Freeman, Gonzalez, Francis, Hartfield, Tan, and Gordon causing the 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Aquila, Freeman, and Gonzalez to the Board; (2) ratify the appointment of Baker Tilly as the Company's independent

registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of WM's principal executive officer, principal financial officer, and three most highly compensated executive officers for 2022.

### *May 9, 2023 Form 10-Q*

94.    On May 9, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended March 31, 2023 (the "1Q23 10-Q"). The 1Q23 10-Q attached SOX certifications signed by Defendants Francis and Lee attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

### *August 9, 2023 Form 10-Q*

95.    On August 9, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2023 (the "2Q23 10-Q"). The 2Q23 10-Q attached SOX certifications signed by Defendants Francis and Hoitt attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

### *November 8, 2023 Form 10-Q*

96.    On November 8, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended September 30, 2023 (the "3Q23 10-Q"). The 3Q23 attached SOX certifications signed by Defendants Francis and Echard attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

### *May 24, 2024 Form 10-K*

97.    On May 24, 2024, the Company filed its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Francis, Echard, Aquila, Bay, Freeman, Gonzalez, Tan, and Gordon and contained SOX certifications signed by Defendants Francis and Echard attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial

reporting, and to the disclosure of all fraud.

### *May 24, 2024 Form 10-Q*

98.    Also on May 24, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended March 31, 2024 (the "1Q24 10-Q"). The 1Q24 10-Q attached SOX certifications filed by Defendants Francis and Echard attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

### *2024 Proxy Statement*

99.    On June 10, 2024, WM filed the 2024 Proxy Statement with the SEC. Defendants Bay, Aquila, Freeman, Gonzalez, Francis, Tan, and Gordon solicited the 2024 Proxy Statement, which contained material misstatements and omissions.

100.    The 2024 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Francis and Gordon to the Board; (2) ratify the appointment of Moss Adams LLP ("Moss Adams") as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of WM's principal executive officer, principal financial officer, and three most highly compensated executive officers for 2023.

101.    Regarding the "Role of the Board in Risk Oversight," the 2024 Proxy Statement stated the following:

> Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, cybersecurity, legal and compliance, and reputational. We have designed and implemented processes to manage these risks. Management is responsible for the day-to-day implementation, oversight and management of risks and risk processes our company faces, while the Board, as a whole and assisted by its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed.

The Board administers this oversight function directly through the Board as a whole, as well as through various Board committees that address risks inherent in their respective areas of oversight. The Board believes that open communication between management and the Board is essential for effective risk management and oversight. Consistent with this approach, the Board, with the assistance of its committees, regularly reviews our strategic and operational risks in the context of discussions with management, question and answer sessions, and reports from the management team at each of its regular meetings. Directors also have access to management outside of its regular meetings and are free to ask questions and receive information necessary to perform their duties as a director.

In particular, the Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company, and for coordinating with management on decisions relating to any matters that carry potential enterprise-level risks. The Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including management's guidelines and policies around quarterly reporting. The Audit Committee is also responsible for monitoring compliance with legal and regulatory requirements, including our Related Person Transaction Policy, in addition to oversight of the performance of our internal audit function. The Audit Committee's responsibilities also include primary responsibility to help the Board oversee the Company's enterprise risk assessment and management policies, procedures and practices (including, together with assistance from the Technology Committee, those risks related to information security, cybersecurity and data protection), as well as review and determination of material commercial relationships and mergers, acquisitions or similar transactions that may have a material impact on the Company. The Nominating and Corporate Governance Committee is responsible for monitoring the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. The Compensation Committee is responsible for assessing and monitoring whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. The Technology Committee is responsible for oversight of the management of risks related to the Company's technology, data, information security and tracking, and related matters, including disclosure of the Company's key metrics and other operational data, together with assisting the Audit Committee with oversight of those risks related to information security, cybersecurity and data protection.

102. Regarding the Code of Conduct, the 2024 Proxy Statement stated the following:

> The Board adopted a Code of Conduct (the "Code of Conduct"), applicable to all of our employees, executive officers and directors. The Code of Conduct is available on our website at ir.weedmaps.com. The nominating and corporate governance committee of the Board is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for employees, executive officers and directors. We expect that any amendments to the Code of Conduct, or any waivers of its requirements, will be disclosed on our website.

103. Defendants Bay, Aquila, Freeman, Gonzalez, Francis, Tan, and Gordon caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

104. The 2024 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

105. As a result of Defendants Bay, Aquila, Freeman, Gonzalez, Francis, Tan, and Gordon causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Francis and Gordon to the Board; (2) ratify the appointment of Moss Adams as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve, on a non-binding advisory basis, the

compensation of WM's principal executive officer, principal financial officer, and three most highly compensated executive officers for 2023.

### *August 8, 2024 Form 10-Q*

106.    On August 8, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2024 (the "2Q24 10-Q"). The 2Q24 10-Q attached SOX certifications filed by Defendants Francis and Echard attesting to the accuracy of financial reporting, to WM's implementation of adequate internal controls over financial reporting, and to the disclosure of all fraud.

107.    The statements in ¶¶74-76, 84-86, 94-98, and 106 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) due to the foregoing, WM did not maintain adequate internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### **The Truth Emerges**

108.    The truth began to emerge on August 9, 2022 when WM disclosed in a Form 8-K and in the 2Q22 10-Q that the Board had received an internal complaint regarding "the calculation, definition, and reporting of [its] MAUs." In relevant part, the 2Q22 10-Q disclosed the following:

> …one of the ways in which we acquire users is through paid advertising. To an increasing degree over time, growth of our monthly active users, reported as MAUs, has been driven by the purchase of pop-under advertisements, which are marketing advertisements on third party websites that automatically present our platform on users' screens in certain circumstances. Our internal data suggests that the vast majority of users who are directed to weedmaps.com via pop-under advertisements close the site without clicking on any links. Based on management's review, users whose access to the website resulted from these pop-under advertisements represented approximately 65% of our MAUs as of June 30, 2022, and 54%, 50% and 54% of our MAUs as of March 31, 2022, December 31, 2021 and September 30, 2021, respectively.

109.   On this news, the price per share of the Company's stock fell $0.87, or over 25%, from a closing price of $3.46 on August 9, 2022 to close at a price of $2.59 on August 10, 2022.

110.   However, the truth did not fully emerge until September 24, 2024, when the SEC issued the Release announcing it had charged WM, Defendant Beals, and Defendant Lee for making negligent misrepresentations in WM's public reporting of MAUs. The Release further revealed that the SEC had "also instituted a related settled administrative proceeding against WM Technology" and that WM "also agreed to pay a civil penalty of $1,500,000." In relevant part, the Release stated:

> The SEC's complaint against Beals and Lee alleges that from May 2021 to May 2022, including during a merger with a special purpose acquisition company through which WM Technology became a public company in June 2021, WM Technology misleadingly reported substantial and continued MAU growth and emphasized the strength and expansion of its user base in its public filings and earnings calls. According to the complaint, although WM Technology's SEC filings stated that it determined its MAU by counting the total number of users that had "engaged with" the WM Technology site in a given period, in truth, a large and increasing percentage of the users of the WM Technology site were instead persons who visited a third-party site, and who were then automatically shown the WM Technology site by way of a "pop-under" advertisement. As alleged by the SEC, these purportedly "active" users did not volitionally seek out the WMTechnology site, and, in most instances, did not click on any links or engage in measurable activity on the WM Technology site. The SEC's complaint further alleges that despite the publicly reported growth in MAU, WM Technology's user engagement metrics were stagnant or declining. The SEC also alleges that Beals and Lee were repeatedly advised of these declining user trends on the WM Technology site and the fact that these non-engaging users were making up an increasingly large percentage of WM Technology's total MAU, but failed to reasonably follow up and negligently continued to sign WM Technology's SEC filings and make public statements that reported MAU numbers that included non-engaging users when discussing the company's purportedly growing user base.

111.   In addition, the Release disclosed that, as part of the Company's agreement to settle the SEC's administrative claims, WM "agreed to the entry of a cease-and-desist order

prohibiting further violations of Sections 17(a)(2) and (3) of the Securities Act and Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, 13a-15(a), and 14a-9 thereunder."

112.    On this news, the price per share of the Company's stock fell by 1.9% to close at $0.92 per share on September 25, 2024.

## **DAMAGES TO WM**

113.    As a direct and proximate result of the Individual Defendants' conduct, WM has lost and will continue to lose and expend many millions of dollars.

114.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

115.    Such expenditures include, but are not limited, to costs related to the SEC's charges against the Company and Defendants Beals and Lee.

116.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

117.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

118.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

119.    As a direct and proximate result of the Individual Defendants' conduct, WM has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

120.   Plaintiff brings this action derivatively and for the benefit of WM to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of WM, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

121.   WM is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

122.   Plaintiff is, and has been at all relevant times, a shareholder of WM. Plaintiff will adequately and fairly represent the interests of WM in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

123.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

124.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, WM's Board consisted of the following seven individuals: Defendants Francis, Aquila, Bay, Freeman, Gordon, and Gonzalez (the "Director-Defendants") and non-party Glen Ibbott (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was filed.

125.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company

to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

126.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted WM to issue materially false and misleading statements. Specifically, the Director-Defendants caused WM to issue false and misleading statements which were intended to make WM appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

127.    Additional reasons that demand on Defendant Francis is futile follow. Defendant Francis has served as a Company director since June 2021 and as Executive Chair since August 2022. Defendant Francis also co-founded Legacy WM and served as Chairperson of Legacy WM's board of managers from March 2019 to June 2021, CEO of Legacy WM from February 2016 to March 2019, and as President of Legacy WM from January 2009 to February 2016. Thus, as the Company admits, he is a non-independent director. Defendant Francis has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Francis solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Francis also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Francis is named as a defendant in the Securities

Class Action. For these reasons, Defendant Francis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Aquila is futile follow. Defendant Aquila has served as a Company director since June 2021. He also serves as Chair of the Compensation Committee. Defendant Aquila has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Aquila solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Aquila also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Aquila breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Bay is futile follow. Defendant Bay has served as a Company director since March 2022. He also serves as a member of the Audit Committee and the Compensation Committee. Defendant Bay has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Bay solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Bay also signed the false and misleading 2022 and 2023 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties

to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Bay breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130. Additional reasons that demand on Defendant Gordon is futile follow. Defendant Gordon has served as a Company director since June 2021. He also serves as a member of the Audit Committee and the Compensation Committee. Defendant Gordon has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Gordon solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Gordon also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Gordon is named as a defendant in the Securities Class Action. For these reasons, Defendant Gordon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131. Additional reasons that demand on Defendant Freeman is futile follow.

Defendant Freeman has served as a Company director since June 2021. She also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Freeman has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Freeman solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Freeman also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate her motive in facilitating and participating in the scheme. For these reasons, Defendant Freeman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Gonzalez is futile follow. Defendant Gonzalez has served as a Company director since June 2021. She also serves as Chair of the Audit Committee. Defendant Gonzalez has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Gonzalez solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Gonzalez also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties

to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate her motive in facilitating and participating in the scheme. For these reasons, Defendant Gonzalez breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

133.   Additional reasons that demand on the Board is futile follow.

134.   Defendants Gonzalez, Freeman, Gordon, and Bay (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

135.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-

Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

136. WM has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for WM any part of the damages WM suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

137. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

138. The acts complained of herein constitute violations of fiduciary duties owed by WM's officers and directors, and these acts are incapable of ratification.

139. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of WM. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-

insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of WM, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

140.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause WM to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

141.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### **FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

142.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

Verified Shareholder Derivative Complaint

144.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

145.    Under the direction and watch of the Individual Defendants, the 2022, 2023, and 2024 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

146.    The Proxy Statements also failed to disclose, *inter alia*, that: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

147.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to the reelection of directors to the Board.

148.    As a result of Defendants Beals, Bay, Aquila, Freeman, Gonzalez, Francis, Gordon, Hartfield, and Tan causing the 2022 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Beals, Tan, and Bay to the Board,

thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Baker Tilly as the Company's independent registered public accounting firm for the 2022 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of WM's principal executive officer, principal financial officer, and three most highly compensated executive officers for 2021.

149. As a result of Defendants Bay, Aquila, Freeman, Gonzalez, Francis, Hartfield, Tan, and Gordon causing the 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Aquila, Freeman, and Gonzalez to the Board; (2) ratify the appointment of Baker Tilly as the Company's independent registered public accounting firm for the 2023 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of WM's principal executive officer, principal financial officer, and three most highly compensated executive officers for 2022.

150. As a result of Defendants Bay, Aquila, Freeman, Gonzalez, Francis, Tan, and Gordon causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Francis and Gordon to the Board; (2) ratify the appointment of Moss Adams as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of WM's principal executive officer, principal financial officer, and three most highly compensated executive officers for 2023.

151. The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2022, 2023, and 2024 Proxy Statements.

152. Plaintiff, on behalf of WM, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

153. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154. Each Individual Defendant owed to the Company the duty to exercise candor,

good faith, and loyalty in the management and administration of WM's business and affairs.

155.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

156.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of WM.

157.    In breach of their fiduciary duties owed to WM, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the MAU metric had been willfully inflated, and did not accurately represent the amount of monthly active users; and (2) WM did not maintain adequate internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

158.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

159.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, seven of the Individual Defendants sold Company shares at inflated prices for combined total proceeds of approximately $2 million.

160.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

161.    The Individual Defendants had actual or constructive knowledge that the

Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of WM's securities.

162.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of WM's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

163.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

164.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, WM has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

165.    Plaintiff, on behalf of WM, has no adequate remedy at law.

## THIRD CLAIM
### Against Individual Defendants for Unjust Enrichment

166.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

167.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, WM.

168.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from WM that was tied to the performance or artificially inflated valuation of WM, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

169.   Plaintiff, as a shareholder and a representative of WM, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

170.   Plaintiff, on behalf of WM, has no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Abuse of Control

171.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence WM, for which they are legally responsible.

173.   As a direct and proximate result of the Individual Defendants' abuse of control, WM has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

174. Plaintiff, on behalf of WM, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

175. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of WM in a manner consistent with the operations of a publicly held corporation.

177. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, WM has sustained and will continue to sustain significant damages.

178. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

179. Plaintiff, on behalf of WM, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Individual Defendants for Waste of Corporate Assets**

180. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

182. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused WM to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and

its products.

183.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

184.    Plaintiff, on behalf of WM, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Beals, Lee, Francis, Echard, Hoitt, and Gordon for Contribution Under Sections 10(b) and 21D of the Exchange Act

185.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.    WM and Defendants Beals, Lee, Francis, Echard, Hoitt, and Gordon are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Beals, Lee, Francis, Echard, Hoitt, and Gordon's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

187.    Defendants Beals, Lee, Francis, Echard, Hoitt, and Gordon, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

188.    Accordingly, Defendants Beals, Lee, Francis, Echard, Hoitt, and Gordon are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

189.    As such, WM is entitled to receive all appropriate contribution or indemnification from Defendants Beals, Lee, Francis, Echard, Hoitt, and Gordon.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of WM, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to WM;

(c) Determining and awarding to WM the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing WM and the Individual Defendants to take all necessary actions to reform and improve WM's corporate governance and internal procedures to comply with applicable laws and to protect WM and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of WM to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding WM restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including

Verified Shareholder Derivative Complaint

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: November 18, 2024                Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Toby Pearson, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 18\_\_ day of November, 2024.

DocuSigned by:

*Toby Pearson*
8A8425C3F09F4E9...

Toby Pearson